Affirmed and Opinion filed April 3, 2008








Affirmed and Opinion filed April 3, 2008.

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-06-00557-CV

_______________

 

DOUGLAS K. BROCAIL, Appellant

 

V.

 

DETROIT TIGERS, INC., Appellee

                                                                                                                                               


On Appeal from the 125th District Court

Harris County, Texas

Trial Court Cause No. 2002B48741

                                                                                                                                               


 

O P I N I O N

In this case, a major league baseball
player for the Detroit Tigers (the AClub@) sued the Club for injuries to his
pitching arm.  The Club was granted summary judgment on the grounds, inter
alia, that the player=s claims were barred by the federal Labor-Management
Relations Act, the Michigan Workers Disability Compensation Act, and Michigan=s statute of frauds.  We affirm. 

 








I.  Factual
and Procedural Background

Appellant Douglas Brocail is a
professional relief pitcher and a union member of the Major League Baseball
Players Association.  As such, his employment agreements with major league
baseball teams (AClubs@) are subject to a collective bargaining agreement (ACBA@) negotiated between the players and
the member Clubs.  This case concerns alleged acts or omissions that occurred
or began during the 2000 baseball season, when Brocail was employed by
appellee, the Detroit Tigers, Inc.  

A.        The
Employment Documents

Pursuant to the terms of the CBA,
Players and Clubs are required to execute a specific form of a standard
contract (the Uniform Player=s Contract or AUPC@) when entering into an employment
agreement.  Under the UPC governing Brocail=s employment by the Club, he received
a $600,000 signing bonus, a salary of $900,000 for the 2000 season, and a
guaranteed salary of $2 million for the 2001 season.  In section 6(a) of the
UPC, the parties agreed that Brocail=s contract could be assigned to any
other baseball clubs.  In section 6(b), Brocail agreed that, Ashould the Club contemplate an
assignment of this contract to another Club or Clubs, the Club=s physician may furnish to the
physicians and officials of such other Club or Clubs all relevant medical
information relating to@ Brocail.  Brocail further agreed to Aaccept, abide by and comply with all
provisions of the Major League Agreement, the Major League Rules, and the Rules
or Regulations of the League of which the Club is a
member . . . .@[1]  These provisions included League
Regulation 2, which provides as follows: 








The Player, when requested by the Club, must submit to
a complete physical examination at the expense of the Club, and if necessary to
treatment by a regular physician or dentist in good
standing. . . . Disability directly resulting from injury
sustained in the course and within the scope of his employment under this
contract shall not impair the right of the Player to receive his full salary
for the period of such disability or for the season in which the injury was
sustained (whichever period is shorter), together with the reasonable medical
and hospital expenses incurred by reason of the injury and during the term of
this contract or for a period of up to two years from the date of initial
treatment for such injury, whichever period is longer, but only upon the
express prerequisite conditions that (a) written notice of such injury,
including the time, place, cause and nature of the injury, is served upon and
received by the Club within twenty days of the sustaining of said injury and
(b) the Club shall have the right to designate the doctors and hospitals
furnishing such medical and hospital services.  Failure to give such notice
shall not impair the rights of the Player, as herein set forth, if the Club has
actual knowledge of such injury.  All workmen=s compensation payments received by the Player as compensation for loss
of income for a specific period during which the Club is paying him in full,
shall be paid over by the Player to the Club.  Any other disability may be
ground for suspending or terminating this contract.

 

The parties also included ASupplemental Agreements@ in the UPC, such as the following:

 

The Club and the Player covenant that this contract,
the Basic Agreement and the Agreement Re Major League Baseball Players Benefit
Plan effective April 1, 1996 and applicable supplements thereto fully set forth
all understandings and agreements between them, and agree that no other understandings
or agreements, whether heretofore or hereafter made, shall be valid,
recognizable, or of any effect whatsoever, unless expressly set forth in a new
or supplemental contract executed by the Player and the Club (acting by its
President or such other officer as shall have been thereunto duly authorized by
the President or Board of Directors as evidenced by a certificate filed of
record with the League President and Commissioner) and complying with the Major
League Rules.

 

B.        Agreement
to Provide Medical Services








The Club represents that under an AAgreement to Provide Medical Services@ to the Club, the Henry Ford Center
for Athletic Medicine (the ACenter@) agreed to select and provide well-qualified medical doctors
to act as Ateam physicians@ in exchange for a fixed annual fee.[2] 
The Center and the Club further agreed that such physicians would remain
employees of the Center, and that the A[a]greement is intended solely for
the benefit of the Parties hereto and shall not be deemed to create any rights
in any other person or entity.@  The Center designated Dr. Terrence Lock, a board-certified
orthopaedic surgeon, to act as one of the team physicians.

C.        Injury
and Treatment While Employed by the Tigers 

On June 14, 2000 in Detroit,
Michigan, Brocail began to complain of pain and inflammation in his right
elbow.  A follow-up injury report contained the notation that an x-ray
performed the same day revealed spurring and new bone formation at the medial
epicondyle.  Another note entered two days later records that, per Dr. Lock,
Brocail had Aspurring with inflammation medial epicondyle,@ but the ligaments and tendons were
intact.  An injury report also records that Dr. Lock examined Brocail again on
June 28, 2000, and Brocail was still tender but Agetting better,@ and physicians would Aconsider CT if [the pain]
persist[ed.]@  Brocail was examined and x-rayed again on July 10, 2000.

After pitching on August 18, 2000,
Brocail experienced increased medial soreness and mild swelling.  He was placed
on the disabled list; had additional x-rays on August 21; and was examined by
Dr. Failla, another physician employed by the Center, on August 22, 2000.  The
following day, Brocail sought a second opinion from Dr. James Andrews in
Birmingham, Alabama.  The Club paid for Brocail=s consultation with Dr. Andrews.  

Brocail returned to Michigan, and at
the beginning of September 2000, he was removed from the disabled list.  After
he practiced pitching on September 6 or 7, 2000, he was again restricted from
throwing, and additional tests were performed on September 19, 2000.  








On September 22, 2000, Dr. Kyle
Anderson, another of the Center=s physicians, performed arthroscopic surgery on Brocail=s elbow.  Dr. Anderson noted Avery significant spur formation@ and removed two loose bone
fragments.  The sutures were removed on September 29, 2000, and Brocail was
placed on the 60-day disabled list.  Brocail decided to return to his home in
Missouri City, Texas while recuperating from surgery, and he received
rehabilitation services in the neighboring city of Sugar Land.[3] 
He was removed from the disabled list in the first half of November 2000, and
on or about December 11, 2000, the Club traded Brocail to the Houston Astros. 
Brocail=s medical bills through December 20,
2000 were paid by the Club=s worker=s compensation insurance carrier.

D.        Injury
and Treatment While Employed by the Astros

On April 4, 2001, Brocail heard a
loud pop in his right elbow while pitching in Texas.  He played in four more Arehabilitation outings,@ then consulted Dr. Thomas Mehlhoff
in Houston on April 17, 2001.  He was diagnosed with a full tear of the medial
collateral ligament and a partial tear of the flexor tendon.  He subsequently
had surgery in Houston to reconstruct the medial collateral ligament.  Due to
the long recovery time from the surgery, Brocail did not continue to pitch for
the Astros.  The Astros paid Brocail=s 2001 salary, but when his contract
expired at the end of that season, it was not renewed.  Brocail was not paid a
salary for the 2002 and 2003 seasons.  According to Brocail, he returned to
pitching for the Texas Rangers in 2004.

E.        Brocail=s Allegations 








On September 20, 2002, Brocail sued
his Michigan and Texas health care providers.  In addition, he sued the Club
for negligence, fraud, fraudulent concealment, fraudulent inducement, negligent
misrepresentation, gross negligence, and breach of contract.  According to
Brocail, the Club Aencouraged and/or directed him to seek treatment from team
personnel that did not possess the expertise, skill, training, experience,
ability, competence and/or knowledge to properly diagnose and treat an elbow
injury sustained by a major league baseball pitcher . . . .@  Brocail further alleged that the
Club encouraged or directed him to undergo treatment that would not cure his
injury and failed to (a) establish policies and procedures for the
treatment of its players, (b) follow team physicians= orders, (c) fully disclose the
true extent of his condition and his fitness to play baseball, (d) use
reasonable care to protect his health and investment, (e) fully advise him
of the adverse effects of continued medical and rehabilitative treatment,
(f) advise him of options concerning his condition, (g) perform
appropriate examinations, and (h) advise the Houston Astros of the true
extent of his ability to play baseball.  In addition, he contends the Club was
negligent in hiring team personnel.  Brocail also pleaded the discovery rule,
agency, ostensible agency, agency by estoppel, equitable estoppel, promissory
estoppel, vicarious liability, and Aintentional torts,@ and sought punitive damages and
attorneys= fees.  Finally, he pleaded that:

[Brocail=s] claims are not within the scope of
any purportedly applicable worker=s compensation laws and are not
barred by any exclusive remedy provision therein . . . . As a
professional athlete whose average weekly wage was not less than 200% of the
state average weekly wage, Brocail had no right to the recovery of weekly
compensation benefits and any exclusive remedy provision does [not] apply.@[4] 

On January 31, 2003, the trial court
dismissed Brocail=s claims against the Michigan health care providers for lack
of personal jurisdiction.  Brocail v. Anderson, 132 S.W.3d 552 (Tex.
App.CHouston [14th Dist.] 2004, pet.
denied).  Brocail subsequently non-suited his claims against the remaining
health care providers.

F.        Summary
Judgment

On June 29, 2005, the Club moved for
final summary judgment on the following six grounds:

(i)        Section 301 of the Labor-Management
Relations Act (ALMRA@)[5]
preempts and bars Brocail=s claims because (a) he did not assert his claim
within the applicable federal six-month statute of limitations, and (b) he
failed to exhaust his remedies under the collective bargaining agreement;

 








(ii)       the exclusive-remedy provision of the
Michigan Worker=s Disability Compensation Act (the AWDCA@) bars Brocail=s claims;[6]

 

(iii)     Michigan=s
statute of frauds bars Brocail=s claims
because the alleged oral promises regarding medical treatment or warranties
were not in writing;

 

(iv)      Brocail=s
promissory estoppel claim fails as a matter of law because (a) any such
promise is not sufficiently clear and definite to allow recovery,
(b) Brocail could not have reasonably relied upon the alleged promise as a
matter of law, and (c) any promissory estoppel claim is not viable in
light of the contract between Brocail and the Club;

 

(v)       Brocail=s
vicarious liability theories fail as a matter of law because (a) the
medical providers for whom Brocail contends the Club is vicariously liable are
independent contractors, and (b) the purported wrongdoers are within the
scope of immunity provided under applicable worker=s compensation law; and 

 

(vi)      Brocail=s Amedical fraud@
claims fail as a matter of law because (a) Brocail cannot meet the high
burden required to show an Aintentional act@ under Michigan worker=s compensation law, (b) Brocail=s
allegations do not relate to a past or existing fact, (c) his fraud claims
are Amerely recast medical negligence claims,@ (d) any alleged misrepresentation could not have
caused Brocail injury, and (e) any alleged reliance was unreasonable.

 

The trial court granted the motion
without specifying its grounds.  Brocail appeals the judgment regarding his
tort claims, but does not appeal the judgment on his claim for breach of
contract.

II.  Issues Presented








Brocail presents nine issues on
appeal, and the parties agree that Michigan substantive law applies.[7] 
In his first issue, Brocail contends the Club failed to assert in its motion
for summary judgment that specific parts of the CBA or UPC required
interpretation in order to resolve Brocail=s claims.  He argues in his second
and third issues that no interpretation of any part of the CBA or UPC is
required, and no part of either agreement created or precluded the duties that
are the bases of his tort claims.  In his fourth issue, Brocail contends that
the exclusive-remedy provision of the WDCA does not bar damage claims for which
it affords no compensation.  Brocail argues in his fifth issue that the Club
failed to negate the misrepresentation, reliance, and causation elements of his
fraud claims.  In his sixth issue, Brocail contends that the
intentional-conduct exception to the exclusive-remedy provision of the WDCA
applies.  In his seventh issue, he challenges the Club=s assertion that the Michigan statute
of frauds bars his claims.  He argues in his eighth issue that the Club did not
meet its burden to negate Brocail=s various liability allegations. 
Finally, Brocail contends in his ninth issue that the Club=s misrepresentations are sufficiently
definite to support Brocail=s claim for promissory estoppel.

III.  Standard of Review

We analyze a traditional motion for summary
judgment under a well-established standard of review.  The movant bears the
burden to show that there is no genuine issue of material fact, and that it is
entitled to judgment as a matter of law.  Tex.
R. Civ. P. 166a(c).  We review the motion and the evidence de novo,
taking as true all evidence favorable to the nonmovant, indulging every
reasonable inference, and resolving any doubts in the nonmovant=s favor.  Valence Operating Co. v.
Dorsett, 164 S.W.3d 656, 661 (Tex. 2005).  When, as here, the trial court
does not specify the grounds on which the judgment is based, we will affirm the
judgment if it is correct on any legal theory expressly placed at issue band
supported by the evidence.  Tex. R. Civ.
P. 166a(c) (stating that issues must be Aexpressly set out in the motion or in
an answer or any other response@); Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex.
2001) (per curiam) (holding that when the grounds for the ruling are not
specified, we affirm Aif any of the theories advanced are meritorious@); Stiles v. Resolution Trust
Corp., 867 S.W.2d 24, 26 (Tex. 1993) (holding that a summary judgment
cannot be affirmed on grounds not expressly set out in the motion or response).








IV.  Analysis

The Club=s motion for summary judgment was
largely based on the application of (a) preemption under the
Labor-Management Relations Act (ALMRA@), (b) the exclusive-remedy provision
of the Michigan WDCA, and (c) Michigan=s statute of frauds.  For the sake of
clarity, we group the issues presented on appeal under these headings. 

A.        Labor-Management
Relations Act

As its first basis for summary
judgment, the Club asserted that Brocail=s claims were preempted by section
301 of the LMRA,[8] and thus,
Brocail is bound by the requirements of that Act, including requirements to
exhaust remedies under the applicable collective bargaining agreement and to
assert claims within six months.[9]  See 29
U.S.C. ' 185 (codifying section 301 of
the LMRA).  Brocail contends that his claims are not preempted, and thus, these
requirements do not apply.  Preemption under the LMRA is a question of law,
which we review de novo.  Meredith v. La. Fed=n of Teachers, 209 F.3d 398, 404 (5th Cir. 2000).








Given the importance of maintaining
uniform federal law, Athe Supreme Court has made clear that ' 301 of the LMRA preempts any
state-law claim arising from a breach of a collective bargaining agreement.@  Smolarek v. Chrysler Corp.,
879 F.2d 1326, 1329 (6th Cir. 1989) (en banc).  Preemption under section 301
also applies to many tort claims ostensibly asserted under state law.  Id.
at 1329B30 (citing Allis-Chalmers Corp. v.
Lueck, 471 U.S. 202, 217, 105 S. Ct. 1904 (1985)).  To survive preemption,
tort claims must be Aindependent@ of the CBA.   Lingle v. Norge Div. of Magic Chef, Inc.,
486 U.S. 399, 409B10, 108 S. Ct. 1877, 1883 (1989); Allis-Chalmers Corp.,
471 U.S. at 213, 105 S. Ct. 1904 (analyzing state-law claim to determine if it
was Aindependent of any right established
by contract, or, instead, whether evaluation of the tort claim [was]
inextricably intertwined with consideration of the terms of the labor contract@); Mattis v. Massman, 2004 FED
App. 0003P, 355 F.3d 902, 905 (6th Cir. 2004) (same).  Thus, the LMRA not only
preempts state-law claims that are based directly on rights created by a
collective bargaining agreement, but also preempts claims that are Asubstantially dependent upon analysis
of the terms made between the parties in a labor
contract . . . .@  Stringer v. Nat=l Football League, 474 F. Supp. 2d
894, 900 (S.D. Ohio 2007)
(quoting Allis-Chalmers Corp., 471 U.S. at 220, 105 S. Ct. at 1916). 
But Aneither a tangential relationship to
the CBA, nor [a] defendant=s assertion of the contract as an affirmative defense [can]
turn an otherwise independent claim into a claim dependent on the labor
contract.@  DeCoe v. Gen. Motors Corp., 1994 FED App. 0261P, 32 F.3d 212,
216 (6th Cir. 1994).

Courts follow a two-step approach to
determine whether a state-law tort claim is sufficiently Aindependent@ to survive LMRA preemption.  First,
the court Amust examine whether proof of the state law claim requires interpretation
of collective bargaining agreement terms.@[10]  Second, the court Amust ascertain whether the right
claimed by the plaintiff is created by the collective bargaining agreement or
by state law.@[11]  The claim is preempted unless it is
created by state law and does not require interpretation of the CBA.[12] 
If a plaintiff can prove all of the elements of the claim without the need for
contract interpretation, then his claim is independent of the labor agreement
and is not preempted.[13] But if
resolution of the state-law claim is Asubstantially dependent@ on an analysis of the terms of the
CBA or Ainextricably intertwined@ with it, the claim is preempted by
the LMRA.[14] 








1.         Asserted
as a Basis for Summary Judgment

In his first issue, Brocail contends
that because the Club=s motion contains no assertion that any specific part of the
CBA or UPC must be interpreted to resolve any of Brocail=s claims, the Club did not expressly
move for summary judgment on the grounds that Brocail=s claims are preempted by the LMRA. 
Thus, he reasons, summary judgment cannot be affirmed on this basis.  The Club
responds that Brocail failed to specially except to the motion and therefore
waived his complaint that the motion lacked specificity.  See McConnell v.
Southside Indep. Sch. Dist., 858 S.W.2d 337, 342 (Tex. 1993) (plurality
op.) (AAn exception is required should a
non-movant wish to complain on appeal that the grounds relied on by the movant
were unclear or ambiguous.@); Franco v. Slavonic Mut. Fire Ins. Ass=n, 154 S.W.3d 777, 784 (Tex. App.CHouston [14th Dist.] 2004, no pet.)
(special exception is required to preserve complaint that a motion for summary
judgment is vague or lacks specificity).  The excepting party also must obtain
a ruling on the special exception to preserve the issue for appeal.  Tex. R. App. P. 33.1; Franco,
154 S.W.3d at 784.

Rather than specially excepting to
the alleged omission and thereby giving the Club an opportunity to amend,
Brocail challenged the alleged omission substantively.  In his response, he
asserted that the Club Afail[ed] to identify a single provision of the CBA or UPC
that must be interpreted to resolve Brocail=s tort claims@ or Ato resolve the factual issues@ identified in the motion for summary
judgment.  According to Brocail=s arguments in the trial court, the Club=s failure to cite a specific provision
of the CBA that requires  interpretation demonstrates that no interpretation is
necessary to resolve his claims.[15]








We agree with the Club.  A special
exception was required to preserve Brocail=s argument for appeal.  Tex. R. App. P. 33.1; Franco,
154 S.W.3d at 784.  And even if Brocail=s argument could be construed as a
special exception to the motion=s lack of specificity, Brocail identifies no ruling in the
record on such an exception.  See Tex.
R. App. P. 33.1(a)(2) (to preserve a complaint for appellate review, the
record must show that the trial court implicitly or expressly ruled on the
objection, or the complaining party objected to the trial court=s refusal to rule).  We therefore
conclude that Brocail=s appellate argument regarding the Club=s failure to cite specific provisions
of the CBA is waived, and we overrule Brocail=s first issue.[16]

2.         Need
to Interpret Specific Contract Provisions 

Brocail next contends that the
resolution of his tort claims do not require the interpretation of any specific
provision of the CBA, the UPC, or the League Regulations.  Similarly, he argues
in his third issue that these documents did not create or preclude the duties
that are the bases of his tort claims.  Both arguments are only partially
correct.[17]

 

 








a.         Claims
Based on Duty to Provide Reasonable Medical Care

In support of his argument that his
claims arise under Michigan state law and do not require interpretation of the
CBA, Brocail relies on the following provision of Michigan=s Worker=s Disability Compensation Act: 

The employer shall furnish, or cause
to be furnished, to an employee who receives a personal injury arising out of
and in the course of employment, reasonable medical, surgical, and hospital
services and medicines, or other attendance or treatment recognized by the laws
of this state as legal, when they are needed. 

Mich. Comp.
Laws Ann. ' 418.315(1).  The Club, however,
argues that Brocail=s claims rely on the Club=s alleged breach of a
contractually-implied duty to provide medical care, and A[w]ithout reference to and reliance
on the CBA, the UPC and the Regulations, the Tigers would have no duty or
obligation to provide any medical services to Brocail.@[18]  

We need not look for such an implied
duty in these agreements because the parties are bound by express state
statutes, and the Club could not Aopt out@ of Michigan workers= compensation law.  See Mich. Comp. Laws Ann. ' 418.111 (AEvery employer, public and private, and every
employee, unless herein otherwise specifically provided, shall be subject to
the provisions of this act and shall be bound thereby.@) (emphasis added).  The Club=s position is inconsistent with the
unambiguous language of section 418.315(1), which requires it to provide
reasonable medical care.  








Because the determination of the Club=s duty and alleged breach of duty to
provide Brocail with reasonable medical services can be resolved without
reference to the CBA, the UPC, or the Regulations, these claims are not
preempted by the LMRA.  See Lingle, 486 U.S. at 409B10, 108 S. Ct. at 1883 (A[A]s long as the state-law claim can
be resolved without interpreting the agreement itself, the claim is >independent= of the agreement for ' 301 pre-emption purposes.@).  Thus, Brocail=s claims that the Club breached a
duty to provide reasonable medical care are not preempted by the LMRA.  But as
discussed infra, these claimsCwhich include Brocail=s allegations that the Club (i) encouraged
or directed Brocail to seek treatment from unskilled team personnel;
(ii)  failed to seek determination of proper treatment from a skilled
physician; (iii) Afailed to use reasonable care with plaintiff@; (iv)  failed to use
reasonable care to protect plaintiff=s health; and (v) failed to
perform the appropriate examinations to determine his pre-participation or
qualifying status, identify future risk of injury, determine his fitness to
play baseball, prevent subsequent injury, and assess his rehabilitative statusCare barred by the WDCA.  

Some of Brocail=s claims, however, are not based on
the duty to provide reasonable medical care.  And as discussed below, we reach
a different result concerning the preemption of claims arising from the alleged
violation of duties found only in the CBA.

b.         Claims
Based on Express Contractual Duties

Brocail contends that the Club Afailed to provide a proper second
opinion before encouraging, endorsing or directing Brocail to undergo treatment
. . . .@  But Brocail points to no authority
in Michigan law that required the Club to Aprovide a proper second opinion,@ nor have we found such a
requirement.[19]  To the
contrary, the only basis on which to imply a duty to provide a second medical
opinion is found in the CBA.  

Article XIII, section D of the CBA is
entitled ASecond Medical Opinion@ and provides as follows:








Within 20 days following the
execution of this Agreement, the Clubs will provide an updated, accepted
listing of medical specialists, by specialty and by geographic regions, to whom
Players may upon their request go for diagnosis and a second medical evaluation
of an employment[-]related illness or injury being treated by the Club
physician.  At least two physicians will be designated for each specialty in
each region.  Further, the Association and the Clubs shall promptly agree on
appropriate procedures by which this listing of medical specialists will be
updated annually.  A Player may seek a Asecond evaluation@ from a medical specialist on the
accepted listing who is located outside the geographic region within which the
Player=s Club is located, provided that the
Player is not absent from the Club for an unreasonable time.

Thus, to determine whether the Club
was required to provide a second opinion and to define the meaning of a Aproper second opinion,@ it is necessary to interpret the
CBA.  Consequently, this claim is preempted by the LMRA.  We therefore overrule
Brocail=s second and third issues as they
pertain to any duty of the Club concerning a Asecond opinion.@

We reach a similar result regarding
Brocail=s claims arising from his trade to
the Houston Astros.  Because the CBA governs assignment of his contract,
Brocail=s claim that the Club fraudulently
induced him to enter a contract with the Astros is preempted.  See Burgos
v. Sw. Bell Tel. Co., 20 F.3d 633, 636 (5th Cir. 1994) (AIn order to determine whether
Southwestern Bell acted wrongfully in the way it transferred [the employee]
from one section to another, required him to take different tests, and
ultimately effectuated his termination, an analysis of Southwestern Bell=s obligations under the collective
bargaining agreement is necessary.@).  In particular, it is necessary to
interpret the CBA to determine whether Brocail=s consent to the assignment was necessary,
and whether reliance on any representation by the Club concerning assignment of
his contract was reasonable in light of the CBA.[20] 
See Feitl v. Los Angeles Clippers, 48 F.3d 1227, 1995 WL 100596, at *3
(9th Cir. March 8, 1995) (unpublished mem. op.) (ABecause Feitl knew at the time of the
alleged fraud that any employment he might have with LAC was governed by a CBA,
Feitl must prove that his reliance was justified in light of the CBA.@) (citing Milne Employees Ass=n v. Sun Carriers, Inc., 960 F.2d 1401, 1408B09 (9th Cir. 1991)).  Thus, we
overrule Brocail=s second and third issues as they pertain to his claim of
fraudulent inducement.








B.        Michigan Worker=s Disability Compensation Act

Under Michigan law, A[e]very employer, public and private,
and every employee, unless . . . otherwise specifically
provided [in the WDCA], shall be subject to the provisions of this act and
shall be bound thereby.@  Mich. Comp. Laws
Ann. ' 418.111.  The WDCA applies to all private, non-agricultural
employers who regularly employ three or more employees at one time, excluding
family members employed as domestic servants.  See id. '' 418.115(a); 418.118(1).  In
addition, any private employer who purchases and accepts a valid workers= compensation insurance policy,
except in the case of domestics and agricultural employees, assumes Athe liability for compensation and
benefits imposed by this act upon employers.@  Id. ' 418.121.  

The parties do  not dispute that the
Club had a valid worker=s compensation insurance policy in effect at the time of
Brocail=s injury, and that medical benefits
were paid pursuant to that policy.  Thus, the Club is an employer subject to the
WDCA.  See id. '' 418.111, 418.121.  In addition, Brocail is an employee
as that term is used in the Act:

(1)       As used in this act, Aemployee@
means:

. . .

(l)        Every person in the service of
another, under any contract of hire, express or implied . . . .

. . .

(n)       Every
person performing service in the course of the trade, business, profession, or
occupation of an employer at the time of the injury, if the person in relation
to this service does not maintain a separate business, does not hold himself or
herself out to and render service to the public, and is not an employer subject
to this act.

Id. ' 418.161.  The WDCA further
provides:








The right to the recovery of benefits
as provided in this act shall be the employee=s exclusive remedy against the
employer for a personal injury or occupational disease.  The only exception to
this exclusive remedy is an intentional tort.  An intentional tort shall exist
only when an employee is injured as a result of a deliberate act of the
employer and the employer specifically intended an injury.  An employer shall
be deemed to have intended to injure if the employer had actual knowledge that
an injury was certain to occur and willfully disregarded that knowledge.  The
issue of whether an act was an intentional tort shall be a question of law for
the court.  This subsection shall not enlarge or reduce rights under the law. 

Id. ' 418.131(1).  Here, Brocail seeks to recover for a
personal injury sustained in the course and scope of his employment.  Thus,
with the exception of intentional torts as described above, the WDCA affords
his only remedy.

1.         Uncompensated
Loss of Earnings

To avoid the exclusive-remedy
provision, Brocail points out that section 418.360 of the WDCA bars his receipt
of weekly earnings benefits otherwise available under the act:

(1)       A person who suffers an injury arising out
of and in the course of employment as a professional athlete shall be entitled
to weekly benefits only when the person=s
average weekly wages in all employments at the time of application for
benefits, and thereafter, as computed in accordance with section 371, are less
than 200% of the state average weekly wage.

(2)       This
section shall not be construed to prohibit an otherwise eligible person from
receiving benefits under section 315,[[21]] 319,[[22]]
or 361.[[23]] 








Id. ' 418.360 (internal footnotes referencing prior laws
omitted).  Thus, Brocail reasons, the exclusive-remedy provision of the WDCA
does not apply to his claim for earnings-related damages.  Stated differently,
he argues that section 418.360(1) provides an exception to the exclusive-remedy
provision of section 418.131(1).  

In support of this argument, Brocail
relies on Eversman v. Concrete Cutting & Breaking, Inc., in which
the Michigan Supreme Court explained:

The primary purpose of the worker=s compensation act is to provide
benefits to the victims of work-related injuries by allocating the burden of
these payments to the employer, and, therefore, ultimately, to consumers.  An
employee who suffers an injury arising out of and in the course of his
employment will be eligible for compensation regardless of whether the employer
was at fault.  In return, the employer is immunized from tort liability because
the worker=s compensation act, under [section]
418.131(1) . . . provides that this compensation is the
exclusive remedy for a personal injury, except for an injury resulting from an
intentional tort. 

463 Mich. 86, 92B93, 614 N.W.2d 862, 864 (2000)
(citations omitted).  Because an employer is immunized for tort liability by
paying the worker Acompensation@ for a work-related injury, Brocail contends that the reverse
must also be true; thus, he argues, if the employee does not receive Acompensation@ for lost earnings, then the employer
is not immunized from tort liability for those damages.  He argues that A[c]ourts across the country have
confirmed that exclusive[-]remedy provisions apply only to damages that are
compensable under a worker=s compensation statute.@ 

a.         Haddad
v. Justice

In support of this position, Brocail
first relies on Haddad v. Justice, in which the Michigan Court of
Appeals wrote:

Plaintiffs= complaint contained a claim for
property damage and the wife=s claim for loss of consortium.  As to the wife=s claim for loss of consortium, it is
barred by [section] 418.131 . . . .  We find that there is
no provision in the Workmen=s Compensation Act applicable to plaintiffs= claim for property damage, and, as
to it, accelerated judgment was improper.

64 Mich. App. 74, 77, 235 N.W.2d
159,160B61 (1975).  








But Haddad does not support
Brocail=s argument.  For example, the WDCA
provides no compensation for loss of consortium; nevertheless, the Haddad court
applied the exclusive-remedy provision to this derivative claim.  

Brocail responds that the loss of
consortium claim in Haddad was not covered because claims under the WDCA
are personal.  But this proposition is not supported by the language of the
Act.  See Mich. Comp. Laws Ann.
' 418.131(2) (AAs used in this section . . . , >employee= includes the person injured, his or
her personal representatives, and any other person to whom a claim accrues
by reason of the injury to, or death of, the employee . . . .) (emphasis
added).  Thus, the exclusive-remedy provision also applies to anyone to whom a
claim accrues as a result of the employee=s injury or death.  

Significantly, the identification of
persons to whom the Act applies is based on the injury, not the compensation
provided.  Regarding the property-damage claim in Haddad, section
418.131 provides that the Aright to recovery of benefits as provided in this
act shall be the employee=s exclusive remedy against the employer for a personal
injury or occupational disease.@  Id. ' 418.131(1) (emphasis added). 
Because the plaintiff=s claim for property damage was not derived from the worker=s claim of personal injury or
disease, it was neither covered nor barred by the WDCA.  But Haddad does
not stand for the proposition that the exclusive-remedy provision is
inapplicable to claims arising from an employee=s injury simply because the Act
provides no compensation for the particular category of damages sought.

b.         Sole
Exception to the Exclusive-Remedy Provision








Contrary to Brocail=s arguments, intentional torts are
the Aonly exception@ to the exclusive-remedy rule.[24] 
Under Michigan law, the applicability of the workers= compensation act is not determined
by whether the claimant is fully compensated for a particular category of
damages, because Abenefits provided by existing compensation acts are not
expected to be full payment for all losses suffered.@[25]  Instead, it is Aa fundamental tenet of workers= compensation statutes that if an injury
falls within the coverage of the compensation law, such compensation shall be
the employee=s only remedy against the employer . . . .@ Reed v. Yackell, 473 Mich.
520, 530, 703 N.W.2d 1, 6B7 (2005) (emphasis added) (quoting Farrell v. Dearborn
Mfg. Co., 416 Mich. 267, 274B75, 330 N.W.2d 397, 399 (1982)); see
also Downie, 122 Mich. App. at 737, 333 N.W.2d at 535 (AWhen an employee=s injury is within the scope of the
Worker=s Disability Compensation Act,
workers= compensation benefits are the
employee=s exclusive remedy against the
employer.@); McKinley v. Holiday Inn, 115 Mich. App. 160, 163, 320 N.W.2d
329, 331 (1982) (per curiam) (AIf the WDCA covers the kind of injury suffered, the act[=s] remedy is exclusive even though
under the facts of the particular case no compensation is payable because there
has been no actual loss of earning capacity.@).  And although Michigan WDCA
benefits do not include weekly wage compensation for a professional athlete
with a salary as large as Brocail=s, wage compensation is not the only Abenefit@ provided by the WDCA.  Highly
compensated athletes remain eligible for benefits such as reasonable medical
care, medical and vocational rehabilitation, and compensation for scheduled
losses.  See Mich. Comp. Laws
Ann. ' 418.360(2).








Michigan=s laws of statutory construction also
prevent us from accepting Brocail=s interpretation of the WDCA.  See
Echelon Homes, L.L.C. v. Carter Lumber Co., 472 Mich. 192, 196, 694 N.W.2d
544, 547 (2005) (AWe begin by examining the plain language of the statute; where
that language is unambiguous, we presume that the Legislature intended the
meaning clearly expressedCno further judicial construction is required or permitted,
and the statute must be enforced as written.@) (emphasis added, citations
omitted).  As the Haddad court emphasized, ALiberal construction [of the Act]
applies whether the employee is seeking benefits under the act or resisting
application of the exclusive remedy provisions of the act to his cause of
action.@  Haddad, 64 Mich. App. at 77,
235 N.W.2d at 160.  

Our analysis is unaffected by the
cases from other jurisdictions cited by Brocail.  See, e.g., Ivey v.
N.C. Prison Dep=t, 252 N.C. 615, 114 S.E.2d 812 (1960); Davis v. Pioneer, Inc., 834
So.2d 739 (Miss. Ct. App. 2003); Superb Carpet Mills, Inc. v. Thomason,
183 Ga. App. 554, 359 S.E.2d 370 (1987).  The Ivey case concerned North
Carolina statutes and exceptions that apply only to prisoners.  Ivey,
252 N.C. at 619, 114 S.E.2d at 815.  The Davis court held that, under
Mississippi law, Awhere an injury is caused by the willful act of an
employee acting in the course and scope of his employment and in the
furtherance of his employer=s business, the Workmen=s Compensation Act is not the
exclusive remedy available to the injured party . . . .@  834 So.2d at 741 (emphasis added)
(quoting Miller v. McRae=s, Inc., 444 So.2d 368, 371 (Miss. 1984)). 
The Michigan WDCA similarly contains an express exception to the
exclusive-remedy provision Awhen an employee is injured as a result of a deliberate
act of the employer and the employer specifically intended an injury.@  Mich.
Comp. Laws Ann. ' 418.131(1) (emphasis added).  And as in Haddad,
the court in Superb Carpet Mills held that A[t]he benefits conferred by the Act
relate to damages for personal injury and not property damage.@  Superb Carpet Mills, Inc.,
183 Ga. App. at 555, 359 S.E.2d at 371.  None of these cases support Brocail=s argument that professional athletes
who are paid at least 200% of the state=s average weekly wage are exempt from
the exclusive-remedy provision of the WDCA.

c.         Application to Brocail=s Causes of Action








Because we must apply the
exclusive-remedy provision of the WDCA in accordance with its unambiguous
meaning, we overrule Brocail=s fourth issue.  We affirm summary judgment as to all causes
of action pleaded by Brocail other than allegations of an Aintentional tort@ as defined by section 418.131(1) of
the WDCA.  See Eversman, 463 Mich. at 92B93, 614 N.W.2d at 864;  Am. Bumper
& Mfg. Co. v. Nat=l Union Fire Ins. Co., 261 Mich. App. 367, 370 n.3, 683
N.W.2d 161, 162 n.3 (2004) (noting that any pleaded cause of action that does
not include allegations of intentional conduct is barred by the
exclusive-remedy provision of the WDCA).  Consequently, we hold that Brocail=s negligence claims are barred by the
Michigan Workers= Compensation Disability Act.  See Harris v. Vernier,
242 Mich. App. 306, 316, 617 N.W.2d 764, 770 (2000) (AMichigan has long recognized that
actions for injuries incurred as a result of a coemployee=s negligence and arising out of the
scope of employment are barred by the exclusive[-]remedy provision [of the
WDCA].@); cf. Great Am. Ins. Co. v. Queen,
410 Mich. 73, 89, 300 N.W.2d 895, 897 (1980) (AAn employee=s common-law right to proceed in tort
against persons other than his employer or co-workers was not altered by
the worker=s compensation act.@) (emphasis added).   

The exclusive-remedy provision also
bars those claims that merely restate Brocail=s negligence and medical negligence
or malpractice claims.  See Jones v. Bouza, 381 Mich. 299, 302, 160
N.W.2d 881, 882 (1968) (en banc) (AIf the [medical] malpractice of a
fellow employee, no less than any other negligence of a fellow employee, gives
rise to a compensable injury, then workmen=s compensation stands as the sole
recourse.@).  The statute similarly bars his claims based on actual agency, ostensible
agency, or vicarious liability for the acts of non-employee health care
providers.  If the tortfeasor was acting as an employee over whom the Club
exercised control, then the WDCA bars the claim.  See Mich. Comp. Laws Ann. ' 418.131.  If the tortfeasor was
an independent contractor over whom the Club lacked control, then the Club also
is not vicariously liable.  See Janice v. Hondzinski, 176 Mich. App. 49,
53, 439 N.W.2d 276, 278 (1989).  Brocail=s agency and ostensible agency
theories fail for the same reasons.  See Decker v. Saini, No. 88-361768
NH, 1991 WL 277590, at *2B4 (Mich. Cir. Ct. Sept. 17, 1991) (unpublished) (holding HMO
liable for acts of physician because, although HMO was a health care insurer
and not a health care provider, the patient reasonably believed, based on the
HMO=s representations, that the HMO was
the physician=s agent, and patient looked to the HMO for treatment and not just for
payment).  








Under any of these theories, Brocail
cannot prevail on his negligence claims against the Club.  See Bayless v.
Philadelphia Nat=l League Club, 472 F.Supp. 625, 630 (D.C. Pa. 1979) (holding that
professional baseball player Aclearly placed himself within the ambit of the Workmen=s Compensation
Act . . . in that he avers 1) the defendant-employer=s assumption of a duty to provide
proper medical care; 2) the failure to provide that care; and 3) resultant
harm.@), aff=d, 615 F.2d 1352 (3d Cir. 1980).  Thus, we overrule
Brocail=s eighth issue as well as his fourth
issue. 

2.         Intentional Torts Exempted from the WDCA=s Exclusive-Remedy Provision 

The determination of whether a
plaintiff has alleged facts constituting a claim for intentional torts is a
question of law for the court, although the question of whether the allegations
are true is an issue for the jury.  Travis v. Dreis & Krump Mfg. Co.,
453 Mich. 149, 154, 551 N.W.2d 132, 135 (1996).  Under Michigan law, an
intentional tort for WDCA purposes occurs only when an employee is injured as a
result of a deliberate act of the employer, and the employer specifically
intended an injury.  Id. at 169, 551 N.W.2d at 141.  An employer is
deemed to have intended to injure if he had actual knowledge that an injury was
certain to occur and wilfully disregarded that knowledge.  Id. at 171,
551 N.W.2d at 142.  Knowledge must be actual; constructive, implied, or imputed
knowledge is not sufficient.  Id. at 173, 551 N.W.2d at 143.  AA plaintiff may establish a corporate
employer=s actual knowledge by showing that a
supervisory or managerial employee had actual knowledge that an injury would
follow from what the employer deliberately did or did not do.@ Id. at 173B74, 551 N.W.2d at 143.  

Here, Brocail pleaded that the Club Ahad actual knowledge that an injury
to Brocail was certain to occur and willfully disregarded that knowledge.@  In its traditional motion for
summary judgment, the Club asserted that the intentional-tort exception did not
apply because (a) the Club is not a medical service provider and did not
diagnose or operate on Brocail, (b) the Club had no intention of trading
Brocail before the surgery, and (c) a member of the Club=s front office is the son of a member
of the Astros=s front office.  None of these grounds defeats or avoids any of the
elements of an Aintentional tort@ as defined by the WDCA.








The Club contends that because
Brocail did not attach evidence to his summary judgment response to controvert
the Club=s evidence, ABrocail failed to raise a genuine
issue of material fact regarding his (1) counter-affirmative defense of >intentional torts= under the Michigan Worker=s Disability Compensation Act;
(2) his fraud claim; and (3) his vicarious liability and agency
claims.@[26]  In support of this argument, the
Club relies on cases addressing counter-defenses that had not been previously
asserted by the non-movant.  See, e.g., Ryland Group, Inc. v. Hood,
924 S.W.2d 120, 121 (Tex. 1996) (per curiam) (plaintiffs raised affirmative
counter-defenses in response to defendant=s motion for summary judgment). 
Here, however, Brocail specifically asserted the counter-defenses at issue. 
Thus, as the movant, the Club was required to disprove the pleaded
counter-defenses in order to establish its entitlement to judgment as a matter
of law.

In sum, the Club failed to
conclusively disprove the factual allegations made in connection with Brocail=s claims of Aintentional torts.@  But although we agree in part with
the argument presented in Brocail=s sixth issue, his Aintentional tort@ allegations nevertheless fail
because they are barred by the Michigan statute of frauds.

C.        Michigan
Statute of Frauds

In its motion for summary judgment,
the Club also argued that Brocail=s claims were barred by the Michigan
statute of frauds, which provides:

(1)     In the following cases an
agreement, contract, or promise is void unless that agreement, contract, or
promise, or a note or memorandum of the agreement, contract, or promise is in
writing and signed with an authorized signature by the party to be charged with
the agreement, contract, or promise:

. . .

 

(g)     An agreement, promise, contract, or warranty of cure relating
to medical care or
treatment.  This subdivision does not affect the right to sue for malpractice
or negligence.








Mich. Comp.
Laws Ann. ' 566.132(1)(g).  The statute does not
apply solely to a promise to cure, but applies also to a promise to provide
medical care with due care or in a non-negligent manner or to any promise
relating to medical care.[27] 

In his Third Amended Petition,
Brocail alleged that the Club  negligently Arepresented that Brocail would be as
good as new and would pitch again soon for the team if he underwent the
treatment by team personnel@ but nevertheless failed Ato use reasonable care to protect
plaintiff=s health. . . .@  Brocail further alleged that the
Club committed fraud and fraudulent concealment by: 

falsely representing that the
treatment rendered by team personnel would cure Brocail=s injury; falsely representing the
nature and outcome of the treatment; falsely representing that the treatment
rendered by team personnel was proper and
necessary; . . . falsely representing that Brocail would be
as good as new and would pitch again soon for the team if he had the treatment.

Brocail made similar allegations in
connection with his claims of fraudulent inducement, negligent
misrepresentation, gross negligence, breach of contract, and promissory
estoppel.








These representations all relate to
medical care and treatment; thus, the representations are unenforceable in the
absence of a writing.  See Powers, 183 Mich. App. at 554, 455 N.W.2d at
373 (rejecting Aplaintiff=s promissory estoppel claim as the alleged promise made by
defendant hospital=s nursing staff related to medical care or treatment and such
promises must be in writing@); see also Malik v. William Beaumont Hosp., 168 Mich.
App. 159, 171B72, 423 N.W.2d 920, 925 (1988) (per curiam) (applying statute of frauds
to claim that hospital falsely represented that kidney transplant would improve
quality of life).  Consequently, the statute of frauds bars claims that Brocail
reasonably relied on the Club=s Apromise@ that he would be cured or would pitch again soon if he
submitted to a particular course of medical treatment.[28] 


The same reasoning applies to Brocail=s claims of fraudulent concealment. 
Fraudulent concealment, also known as fraud by nondisclosure or Asilent fraud,@ cannot occur in the absence of a
legal duty of disclosure.  M&D, Inc. v. W.B. McConkey, 231 Mich.
App. 22, 29, 585 N.W.2d 33, 37 (1998).  But in order to prove a claim of silent
fraud, a plaintiff must show that some type of representation that was false or
misleading was made and that there was a legal or equitable duty of
disclosure.  Id. at 32, 585 N.W.2d at 39.  A[T]he touchstone of liability for
misdirection or >silent fraud= is that some form of representation has been made and
that it was or proved to be false.@  Id. at 30, 585 N.W.2d at
38.  Although the misrepresentation may be made through words or conduct,[29]
the plaintiff=s reliance must have been reasonable.[30] 
But under Michigan law, such reliance on an unwritten representation could not
be considered reasonable in light of the statute of frauds.  See also Malik,
168 Mich. App. at 172B73, 423 N.W.2d at 926 (denying claim for promissory estoppel
because Ait is common knowledge that the
results of medical treatment cannot be guaranteed . . . .@). 








Finally, Brocail argues that this
statute applies only to causes of action styled as claims for breach of
contract.  This argument elevates form over substance: his claim that the Club
fraudulently induced him to undergo treatment by misrepresenting that he would
be cured is based on a promise of cure, and is therefore barred by the statute
of frauds.

We conclude that Michigan=s statute of frauds bars Brocail=s claims based on representations
relating to medical care and treatment.  We therefore overrule Brocail=s fifth, seventh, and ninth issues.

IV.  Conclusion

In summary, we overrule Brocail=s first issue challenging the
specificity of the Club=s assertion of the Labor-Management Relations Act as a basis
for summary judgment.  We further hold that the duty to provide reasonable
medical care arises independently from the collective-bargaining agreement. 
Because that obligation is imposed by the Michigan Workers= Compensation Disability Act, Brocail=s claims arising from an alleged
breach of the duty to provide reasonable medical care are not preempted by the
LMRA.  On the other hand, Brocail=s claims of fraudulent inducement and
failure to provide a proper second opinion are preempted by the LMRA; thus, we
overrule Brocail=s second and third issues concerning such claims. 

Brocail pleaded that those who
performed the medical services at issue were Ateam personnel,@ Club trainers, agents, or
independent contractors under the Club=s control.  In effect, he complains
that his injuries are attributable to a co-employee.  Thus, the WDCA is Brocail=s exclusive remedy for any injury not
caused by an Aintentional tort@ as that phrase is defined under the Michigan WDCA. 
Accordingly, we overrule Brocail=s fourth, and eighth issues.  And
because claims arising from representations concerning Brocail=s medical care and treatment are
barred by Michigan=s statute of frauds, we overrule his fifth, seventh, and
ninth issues. 








Finally, although the Club failed to
conclusively disprove the factual allegations made in connection with Brocail=s Aintentional tort@ claims, the claims to which Brocail
attempted to apply this exception are barred by the LMRA or the Michigan
statute of frauds.  Thus, we overrule his sixth issue.  There being no
remaining claims, we affirm the judgment of the trial court.

 

 

 

/s/        Eva M. Guzman

Justice

 

Judgment
rendered and Opinion filed April 3, 2008.

Panel
consists of Justices Yates, Fowler, and Guzman. 

 

 

 









[1]  UPC, &
9(a).  





[2]  No executed copy of the contract was included in the
summary judgment evidence.





[3]   Brocail had been under contract to the Houston
Astros before joining the Detroit Tigers and maintained a permanent residence
in Texas.





[4]  Brocail alleged that A[d]uring the 2000 season, Brocail developed an injury to his pitching
elbow while playing for defendant.@ 
He further alleged that his Ainjury occurred
in Texas when he was a resident of the State of Texas, . . . and while he was
no longer employed by the Defendant.@





[5]  29 U.S.C. '' 141B87.





[6]  The Club asserted, in the alternative, that Brocail=s claims are barred by Texas workers= compensation law.





[7]  We continue to apply Texas procedural law even when
applying the substantive law of another state. Moonlight Invs., Ltd. v. John,
192 S.W.3d 890, 894 (Tex. App.CEastland 2006,
pet. denied).





[8]  29 U.S.C. '' 141B87.





[9]  29 U.S.C. '' 141B87. See DelCostello v. Int=l Bhd. of Teamsters, 462 U.S. 151, 170B71, 103 S. Ct.
2281, 2293B94 (1983) (assigning such disputes the same
limitations period found in the National Labor Relations Act); 29 U.S.C. ' 160(b).





[10]  DeCoe, 32 F.3d at 216; accord, Jones
v. Roadway Express, Inc., 931 F.2d 1086, 1089 (5th Cir. 1991) (beginning
preemption analysis by examining the elements of the alleged state-law tort). 





[11]  DeCoe, 32 F.3d at 216. 





[12]  Id. 





[13]  Id.  





[14]  Allis-Chalmers Corp, 471 U.S. at 220, 105 S.
Ct. at 1916.





[15]  These arguments seem to rely on the standard
governing no-evidence summary judgments, rather than traditional summary
judgments.  See Cuyler v. Minns, 60 S.W.3d 209, 212B13 (Tex. App.CHouston
[14th Dist.] 2001, pet. denied) (because movant=s failure to identify challenged elements of claims renders a
no-evidence motion for summary judgment legally insufficient under Rule
166a(i), the nonmovant is not required to object). 





[16]  The Club adequately presented the preemption
argument in its summary judgment motion. 





[17]  Interestingly, each party relies for support on
statements by the other=s expert or counsel.  Contrary to its arguments on
appeal, the Club=s general counsel previously denied that the duty to
provide reasonable medical care Ais
a right that flows from@ the CBA and instead agreed that the Club had a duty
under Michigan=s workers=
compensation statutes to provide reasonable medical care.  Brocail also
reversed his litigation strategy, and the Club relies in part on a June 8, 2005
report by Brocail=s expert, Matthew J. Mitten, in which Mitten opines:

Read together, the Collective Bargaining Agreement,
the UPC, and the Regulations establish that a Major League Baseball club, such
as the Detroit Tigers, effectively has a non-delegable duty to provide 
reasonable and appropriate medical care to its players, including an obligation
to provide proper treatment and rehabilitation for their injuries.

But see
Matthew J. Mitten, Team Physicians as Co-Employees: A Prescription that
Deprives Professional Athletes of an Adequate Remedy for Sports Medicine
Malpractice, 50 St. Louis U. L.J. 211,
213 (Fall 2005) (AUnless statutorily excluded from coverage, a
professional team=s players are >employees= who are entitled to workers= compensation benefits for injuries occurring within
the scope of their employment.@).  

Despite the efforts of both sides to characterize such statements as
relevant evidence, the issue of whether claims are preempted by the LMRA is a
question of law to be reviewed de novo.  Bartholomew v. AGL Res., Inc.,
361 F.3d 1333, 1337 (11th Cir. 2004); Meredith, 209 F.3d at  404; Reece
v. Houston Lighting & Power Co., 79 F.3d 485, 487 (5th Cir. 1996); Quesnel
v. Prudential Ins. Co., 66 F.3d 8, 11 n.4 (1st Cir. 1995).  Thus, our
analysis is unaffected by the opinions of these witnesses.





[18]  In support of this argument, the Club cites International
Brotherhood of Electrical Workers v. Hechler. 481 U.S. 851, 862, 107 S. Ct.
2161, 2168 (1987) (concluding that it was necessary to interpret a collective
bargaining agreement to determine the existence and scope of union=s implied duty to ensure a safe workplace).  In Hechler,
however, the plaintiff=s claim expressly was based on alleged breaches of Acontracts and agreements@ and not on the breach of a state statute expressly imposing a duty on
the employer.





[19]  Cf. Mich.
Comp. Laws Ann. ' 418.315(1) (AAfter
10 days from the inception of medical care as provided in this section, the
employee may treat with a physician of his or her own choice by giving to the
employer the name of the physician and his or her intention to treat with the
physician.@).





[20]  The CBA contains provisions addressing circumstances
in which assignment is prohibited or which require the Player=s consent.





[21]  Section 418.315 provides, inter alia, that:

The
employer shall furnish, or cause to be furnished, to an employee who receives a
personal injury arising out of and in the course of employment, reasonable
medical, surgical, and hospital services and medicines, or other attendance or
treatment recognized by the laws of this state as legal, when they are needed. . . . After
10 days from the inception of medical care as provided in this section, the
employee may treat with a physician of his or her own choice by giving to the
employer the name of the physician and his or her intention to treat with the
physician.





[22]  Under this section:

An
employee who has suffered an injury covered by this act shall be entitled to
prompt medical rehabilitation services. When as a result of the injury he or
she is unable to perform work for which he or she has previous training or experience,
the employee shall be entitled to such vocational rehabilitation services,
including retraining and job placement, as may be reasonably necessary to
restore him or her to useful employment.





[23]  This section governs compensation for scheduled
losses.





[24]  Mich. Comp.
Laws Ann. ' 418.131; Bell v. Ren-Pharm, Inc., 269 Mich.
App. 464, 466, 713 N.W.2d 285, 286 (2006); see also  Downie v. Kent
Prods., 122 Mich. App. 722, 738, 333 N.W.2d 528, 536 (1983) (stating that Athe exclusive remedy provision of the act bars any
common law tort cause of action by an employee against his employer@), aff=d in part and rev=d in part, 420 Mich. 197, 362
N.W.2d 605 (1984), amended, 421 Mich. 1202, 367 N.W.2d 831 (1985).





[25]  Franges v. Gen. Motors Corp., 404 Mich. 590,
612, 274 N.W.2d 392, 399 (1979).





[26]  Appellee=s
Brief, at 9.





[27]  Smith v. City of Pontiac, 169 Mich. App. 559,
562, 426 N.W.2d 704, 706 (1988) (per curiam).  In Smith, the plaintiff
brought a wrongful death action against the defendant arising out of a decedent=s treatment at the defendant=s hospital.  Id.  The plaintiff alleged that
the defendant was negligent and breached an implied contract to provide medical
services, including express and implied warranties to exercise due care in
treating the decedent.  Id.  The court held that the plaintiff=s contract claim was invalid because the plaintiff
admitted there was no written agreement that met the statute of frauds
requirement.  Id.; see also Powers v. Peoples Cmty. Hosp. Authority,
183 Mich. App. 550, 554, 455 N.W.2d 371, 373 (1990) (stating that Athe statute requires a writing for any agreement,
promise or contract relating to medical care or treatment as well as any
warranty of cure@ and affirming dismissal of plaintiff=s contract and promissory estoppel claims) (emphasis
added); Virk v. Detroit Receiving Hosp., No. 180621, 1996 WL 33348748,
at *1 (Mich. Ct. App. Oct. 25, 1996) (per curiam, unpublished) (claimant cannot
recover under an alternate theory of promissory estoppel if the claim is barred
by section 566.132(1)(g)).





[28]  Brocail argues that his claims fall within an
exception stated in the last sentence of section 566.132(1)(g): AThis subdivision does not affect the right to sue for
malpractice or negligence.@  But
regardless of whether section 566.132(1)(g) affects the right to sue for
malpractice or negligence, the WDCA does affect that ability, as
discussed supra.  Because the WDCA bars such suits if brought by an
employee against his employer for injuries received in the course and scope of
his employment, we need not consider whether the statute of frauds acts as an
additional bar to those claims.  Instead, we need consider the Michigan statute
of frauds only in connection with any of Brocail=s surviving claims for intentional torts, and the language on which
Brocail relies contains no exception for intentional torts.





[29]  Id. at 33B34,
585 N.W.2d at 40. 





[30]  Novak v. Nationwide Mut Ins Co., 235 Mich.
App 675, 689B91, 599 N.W.2d 546, 553B54 (1999).